IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| ELISA QUIROGA | § | |
| | § | |
| V. | § | C.A. No. _____ |
| | § | |
| UNUM LIFE INSURANCE | § | |
| COMPANY OF AMERICA | § | |

## PLAINTIFF'S COMPLAINT

This is a suit for damages and other relief by Elisa Quiroga against Unum Life Insurance Company of America. It is an action for breach of a disability insurance policy, violation of the duty of good faith and fair dealing, violations of the Texas Insurance Code, violations of the Texas Deceptive Trade Practices Act, and damages.

### Parties

1.  Plaintiff Elisa Quiroga is a resident citizen of Edinburg, Hidalgo County, Texas.

2.  Defendant Unum Life Insurance Company of America ("Unum") is a domestic or foreign insurance company licensed to do business and doing business in the state of Texas. It can be served through its registered agent, Corporation Service Company, 211 East 7th St., Suite 620, Austin, TX 78701-3218, or wherever it may be found.

### Jurisdiction and Venue

3.  This Court has jurisdiction over this civil action pursuant to 28 U.S.C. §1332(a)(1) since it is an action between citizens of two different states and the matter in controversy exceeds the sum of $75,000.

### Facts

4.  Unum is in the insurance business and sells various forms of life insurance and disability insurance. The promise of disability insurance is to provided income protection if an insured is disabled by injury or sickness.

5.  Implicit in the promise of the Unum policy is that it will timely, fairly, and objectively adjust and pay a covered claim. If in doubt about the cause or nature of the insured's disability, Unum implicitly promises to investigate the claim fairly and objectively, and promptly pay if the claim meets the policy requirements.

6.  Elisa Quiroga has been a hard-working, highly motivated worker for decades. She was born in Nuevo Leon, Mexico in 1967 and grew up on a ranch with many brothers and sisters. She dropped out of school in 6th grade to help her family at home, feeding animals, planting crops, and helping prepare food. She got married at 15 years old and became a U.S. resident in 1988. She worked in various jobs and factories, then was licensed as a Certified Nursing Assistant. She also worked for Burlington Coat Factory for 6 years in McAllen, then in Edinberg.

Job with Edinburg School District

7.  Ms. Quiroga started working at Edinberg School District in February 2009 as Food Preparation Staff. She would wash dishes, sweep, prepare meals, and serve meals to the children. The job was physically demanding but satisfying.

8.  As a full-time Edinberg School District employee, Ms. Quiroga was an eligible participant in the Unum LTD policy ("Policy"). The Policy was issued on January 1, 2013, and the policy number was 207726 001. The Policy promised to pay a disability benefit if the insured became disabled from working her regular occupation.

2

9.      The Policy defines disability as a time when the insured is "unable to perform the material and substantial duties of your regular occupation". This is often referred to as "own occ" disability. After 24 months, the definition of disability changes so that the insured must be "unable to perform the duties of any gainful occupation for which you qualify by education, training, or experience". This is often referred to as "any occ" disability.

Back Condition Progressively Worsens

10.     Ms. Quiroga started getting back pain in 2013 which progressively worsened. Once the pain moved down her back and into her legs, she went to see a doctor. Her legs would feel weak, and it was getting hard to work. Somehow, she continued to work in pain from 2014 to 2019.

11.     Every day, Ms. Quiroga would wake up at 5 a.m., get the house ready, get her grandchildren ready for school, feed them, and then get ready for work. She would take painkillers every single day before driving to work. She then worked nonstop until 3:30 p.m. After going home, cooking for the family and cleaning up, she was out of energy. Bedtime was around 7 p.m., and the cycle would begin again the following morning.

12.     Although Ms. Quiroga had a back injection in 2018, it only helped for a short time. Her back pain returned, and then her thyroid condition got worse. She gained weight and felt more tired.

13.     An October 2018 cervical spine MRI revealed posterior protrusion-subligamentous discs at C3-C4, touching the spinal cord, as well as broad based

posterior protrusion-subligamentous disc herniation in central and lateral aspect in both sides at C5-C6.

14. In May 2019, Ms. Quiroga's doctor recommended back surgery. Because the pain was overwhelming, she underwent a lumbar laminectomy and fusion at L5-S1.

15. A lumbar laminectomy, seen below, involves the removal of the back portion of a vertebra in the lower back to create more room within the spinal canal.



16. Spinal fusion is major surgery where one or more spinal bones (vertebrae) are fused together using screws, bolts, and plates. The hardware may be placed in the front or the back of the spine. The disc between the spinal bones is removed and replaced with bone or a spacer. An example of how it appears on x-ray is below:



17. However, the surgery had limited benefits. Ms. Quiroga went to physical therapy to try to get better, but it helped very little.

18. Almost three years later, she is still in pain. The pain is in the lower back and legs, same as before. It is unrelenting. It is there when she wakes up. It is there when she walks. It is where when she sits down. While it can wax and wane, it is present when she gets up or lies down.

19. Because of her surgery and treatment, Ms. Quiroga was forced to stop working. She applied for disability benefits under the Policy. Unum approved the claim on July 3, 2019.

20.    Unfortunately, Ms. Quiroga's health continued to decline. She broke her ankle when she fell in a hole in the ground. She had surgery in September 2019.

21.    It has not been a full recovery. Almost three years later, her right foot still looks swollen. She has less mobility and less flexibility. If she stands or walks too much, the ankle gets more swollen and painful.

## How Unum Handled the Claim

22.    On June 10, 2019, Unum employee Deborah Webber noted that it was reasonable to approve Ms. Quiroga's claim at $700 per and "monitor for recovery/AP&C". Ms. Webber also acknowledged that Ms. Quiroga was not eligible for Social Security Disability Income benefits.

23.    Unum approved the LTD claim on July 3, 2019.

24.    On November 26, 2019, Unum Director Jim Farr, Unum Lead Disability Team Specialist Deborah Webber, and Unum employee Katharine Wolph held a "Forum Discussion". In that discussion, they noted that Ms. Quiroga worked as a school cook, which was medium duty work. They knew that she had a 6th grade education from Mexico and did not know how to use a computer. Based on this information, they decided that it was "likely that she does not have skills to perform an alternative sedentary occupation."

25.    In February 2020, Dr. Rubin Pachero, Ms. Quiroga's orthopedic surgeon, advised Unum that she could not kneel, squat, bend, stoop, push, pull, or lift or carry heavy objects.

26.    On March 19, 2020, Unum Director Jim Farr led another "Forum Discussion". In it, he noted that given Ms. Quiroga's lumbar fusion and "prolonged recovery with

slow bone fusion", she had decreased functional capacity. It was doubtful that she would be able to work in her own occupation, which required lifting/exertion up to 50 pounds.

27. Five days later, Unum Lead Disability Team Specialist Deborah Webber noted that Ms. Quiroga was unlikely to return to her own occupation. She would be monitored for improvement and the potential ability to do light duty work in the future.

28. In August 2020, Dr. Pachero advised Unum that Ms. Quiroga could not do light or sedentary work.

29. In November 2020, Unum began reviewing Ms. Quiroga's claim to determine if she would remain disabled under "any occ" disability.

30. On March 5, 2021, Unum employee Kathryn Linkins had a phone conference with Ms. Quiroga. Ms. Quiroga explained that she had rods and pins in her back, and that she could not work because she had pain all of the time. She could stand and walk for 10-30 minutes depending on how she felt. She could sit for 8-10 minutes, then would need to get up and walk a little.

31. On April 28, 2021, Dr. Melissa Gomez-Martinez, Ms. Quiroga's treating physician, advised Unum that she could not do light duty work because she could not lift more than 5 pounds and could not remain seated or standing for extended periods.

32. The next day, Dr. Pachero advised Unum that Ms. Quiroga could not do light duty work because she could not lift or carry and could not sit or stand for extended periods.

33. On June 3, 2021, Unum employee Dr. Shivansh Pahuja reviewed some of the medical records. Dr. Pahuja concluded that Ms. Quiroga was able to lift up to 20

pounds occasionally. He also decided that she could stand and walk frequently. In coming to these conclusions, Dr. Pahuja implicitly labeled Ms. Quiroga as a malingerer.

34.   One day later, Unum employee Dr. Stephen Kirsch reviewed some of the medical records. Dr. Kirsch concluded that the "existence, intensity, frequency, and duration" of Ms. Quiroga's symptoms was not supported by the medical records. In coming to this conclusion, Dr. Kirsch implicitly labeled Ms. Quiroga as a malingerer and her treating physicians as liars. Dr. Kirsch was the second Unum medical director to label Ms. Granville a malingerer and liar.

35.   To further besmirch Ms. Quiroga's name, Unum paid Dane Street to review some of the records. Dane Street retained Dr. Steven Milos. Dr. Milos concluded that Ms. Quiroga could lift 20 pounds occasionally, had a normal gait, and walked without assistance, so she could frequently stand and walk. Dr. Milos was the third person Unum paid to label Ms. Granville a malingerer.

36.   On June 25, 2021, Unum terminated Ms. Quiroga's claim because it concluded that she was able to perform the duties of other gainful occupations. Unum concluded that she could work as a bench assembler, housekeeping aide, or ticket taker.

37.   Unum's medical directors lacked the qualifications to review Ms. Quiroga's medical records. One was Shivansh Pahuja, who is not a licensed physician in Texas or the United States.

38.   Another was Stephen Kirsch, who opined that the existence, intensity, frequency, and duration of Ms. Quiroga's symptoms were not credible. In making this conclusion, he implied that she was lying, faking, or exaggerating her physical

8

conditions. Unum's aggressive use of its own medical directors to review this claim reveals its underlying motive to terminate Ms. Quiroga's claim, no matter the evidence.

39.  Dr. Kirsch is not licensed to practice medicine in Texas. There is no evidence that he has any hospital privileges or actually sees patients. He is a longtime Unum employee, and his bias and credibility are highly questionable.

40.  Unum's aggressive use of its own medical directors to review this claim reveals its underlying motive to terminate Ms. Quiroga's claim, no matter the evidence. On information and belief, Unum selected these medical directors to review Ms. Quiroga's claim for that very purpose. This pattern of conduct evidences a biased approach and treatment of Unum's disability claims, including this one.

41.  Ms. Quiroga provided additional evidence of her disability in April 2022.

42.  Unum denied the appeal by letter dated June 9, 2022. In doing so, it cherry picked information in order to imply that Ms. Quiroga's physical limitations were modest. It also ignored her reports of pain, implying that she was either exaggerating her symptoms or just lying. It concluded that she was no longer disabled because she could do light duty work.

43.  All of the evidence that Ms. Quiroga submitted demonstrated that she could not sit or stand for extended periods of time.

44.  During this time, Ms. Quiroga struggled to return to work, even though her health would not permit it. She relied on Unum to protect her and look out for her best interests. Unum failed her in several ways.

45.   First, Unum ignored or discounted the evidence from Ms. Quiroga's treating physicians. Once example was the September 26, 2020 office visit with Dr. Rubin Pachero, where he explained that Ms. Quiroga could not do light or sedentary work and would require accommodations which were not available or appropriate for a work environment. Another example was Dr. Marissa Gomez-Martinez's April 28, 2021 letter explaining that Ms. Quiroga could not do light duty work, could not lift more than 5 pounds, could not bend, and could remain seated or standing for extended periods of time.

46.   Second, Unum ignored Ms. Quiroga's consistent reports of pain. She can only sit for 30 minutes at a time. She can only stand for less than 30 minutes at a time. She can only walk for 20 minutes at a time. She uses a back brace that she wears for 3 hours in the morning and 3 hours in the afternoon. She is forced to use a cane and a walker almost every day, especially when the pain is worse. She uses the cane when she can tolerate the pain. She uses the walker when there is more pain. When the pain is too much, she must lie down 3-4 times a day.

47.   Third, as demonstrated above, Unum blindly relied on its own employees to determine that Ms. Quiroga was no longer disabled. Unum's aggressive use of its own medical directors to review this claim reveals its underlying motive to terminate Ms. Quiroga's claim, no matter the evidence. This led to Unum terminating the claim in June 2021.

48.   By April 2022, Ms. Quiroga had provided all information necessary for Unum to approve her ongoing disability benefit.

49.    Ms. Quiroga made a good faith attempt to settle this case before litigation. For instance, she sent a demand letter in April 2022 in which she provided her total damages and desire to settle the matter without the need for litigation.

50.    In May 2022, Unum expressed a desire to negotiate.

51.    In a phone call with Unum, Ms. Quiroga's counsel offered two settlement options: 1) paying the past due benefits and putting her back on claim or 2) negotiating a lump sum buyout of the claim.

52.    On June 7, 2022, Unum advised that it would not offer a single penny to settle the claim.

53.    Having exhausted all pre-suit remedies, Ms. Quiroga brings this action to recover the disability insurance benefits promised in the policy.

## Breach of the Insurance Contract

54.    Plaintiff incorporates the preceding factual allegations.

55.    At all material times, the policy was in full force and effect. All premium payments were timely paid by Plaintiff. Plaintiff provided Unum with the information and evidence needed to properly pay her disability claim. However, Unum breached its duty under the insurance policy by failing and refusing to pay the covered disability claim. The damages include the unpaid monthly disability benefit of $10,800 from June 2021-June 2022, not including interest.

56.    Unum has harmed Ms. Quiroga by refusing to pay the monthly benefits for the above listed time period, all for which she now sues.

## Breach of Duty of Good Faith and Fair Dealing

57.    Plaintiff incorporates the preceding factual allegations.

58.    Insurers have an affirmative common law duty of good faith and fair dealing. That means that in the handling and adjustment of a claim, the insurer is obligated to act in good faith and deal fairly with the policyholder in delivering on the promise of the policy. Unum was obligated to meet this common law obligation once a claim on the policy was made.

59.    The guiding principles of proper claims handling help ensure the insurer meets this obligation. Claims handling personnel must be adequately trained on these principles. These principles include an obligation to promptly acknowledge the claim, timely investigate the claim, and adjust that claim in a fair, objective, and non-biased manner.

60.    Timely adjustment and investigation means seeking information and evidence to answer questions raised that may clarify the insurer's obligation to pay or deny the claim. Traditional claims handling principles also include a responsibility to find coverage, err in favor of the insured, resolve ambiguities and doubt in favor of the insured, and pay the claim if it meets the policy requirements for payment.

61.    An objective and thorough investigation includes inquiry into reasons to pay a claim, along with any reasons to deny the claim. The insurer must look at the positive and negative before making its claim decision. Claims decisions must be based on facts, not guesses or speculation. Artificial obstacles to payment, unreasonable interpretation of policy terms, speculation, outcome-oriented investigations, and bias should pay no role in delivery on its promise. In following these principles, the insurer is positioned to deliver on the promise of the policy. It is also positioned to meet its obligation of good faith and fair dealing.

62.    Unum and its claims personnel failed to follow these claims handling principles. Its adjusters, on information and belief, lacked the requisite training to properly investigate and adjust this claim. They further failed to adjust this claim in a fair and equitable manner. They ignored their responsibility to find coverage or err or resolve doubts in favor of the insured and resolve ambiguities in favor of the insured. They failed to investigate and evaluate this claim objectively and fairly. They merely looked for a reason to deny, ignoring reasons to pay the claim. Unum was fully aware of and endorsed this conduct. In addition, Unum and its adjusters failed to acknowledge Ms. Quiroga's physical condition and instead denied this claim solely based on guesswork and speculation.

63.    Throughout this claim, Unum utterly failed to acknowledge in its communications with Ms. Quiroga that it had an affirmative duty to look for coverage, assist her with her disability claim, and get the proper documents to determine if her disability claim should have been approved or continued. Instead, Unum presumably began and ended its investigation and adjustment of this claim with the lackadaisical approach evinced by its adjusters. In doing so, it sought to find support for its conclusion that Ms. Quiroga's disability claim should be terminated. This was the sole focus of any investigation Unum undertook. It was an outcome-oriented focus seeking to find a reason for denial.

64.    Throughout the claim, Unum's hostile approach was clear. One example was its extensive use of its own medical directors to review some of Ms. Quiroga's medical records. These medical directors are Unum employees. None of them ever spoke with Ms. Quiroga or physically examined her. On information and belief, they are

compensated in a manner designed to encourage them to deny claims, rather than fully and fairly review claims. This underlies a far greater problem - Unum treats its long-term disability claims department as an ongoing source of revenue.

65.    Unfortunately, this is not surprising. Unum was the subject of substantial criticism and review in 2002-2004 for improper claims handling processes. A Multistate Market Conduct Examination was performed "to determine if Unum's disability income claims handling practices reflected systemic unfair claim settlement practices in violation of state laws governing the insurance industry.

66.    After conducting a review of Unum's files, the multistate examination identified the following areas of concern:

  a.  Excessive reliance upon in-house medical professionals;
  b.  Unfair construction of attending physician or IME reports;
  c.  Failure to evaluate the totality of the claimant's medical condition; and
  d.  Inappropriate burden placed on claimants to justify eligibility for benefits. . . in which benefits were denied by the Companies on the grounds that the claimant had failed to provide "objective evidence" of a disabling condition.

67.    The multistate investigation was resolved in November 2004. Unum agreed to comply with the terms of a Regulatory Settlement Agreement ("RSA") which required, among other things, that Unum increase its use of IMEs rather than relying so heavily on the opinions of its own employees.

68.    In 2005, after the RSA was created, Unum created a Performance Based Incentive Plan ("PBI") that it has since worked diligently to keep secret. The PBI has been "further developed, modified and refined over time."

69.    As recently as 2018, Unum's PBI encouraged Unum employees to focus on "business value" and to think "with the mindset of a business owner". Employee bonuses are capped at 8M.

70.    Unum also creates various weekly reports that track its directors' progress in closing claims, which Unum refers to as "recoveries". The weekly reports also compare the progress to a plan made by the finance department. The weekly reports give the director a projection of closing claims through the end of the month and tells the director if he or she is ahead or behind the plan. Directors are expected to know their progress, which are discussed in weekly meetings. Put another way, Unum evaluates the performance of its directors based, at least in part, on the number of claims that they deny.[1]

71.    Proper claims handling conduct requires the insurer, among other things, to work with the insured to find coverage. In this case, Unum worked only to find reasons to deny the claim. Coverage could have easily been found if Unum fully and fairly reviewed the evidence submitted by Ms. Quiroga before she was forced to file this lawsuit. Doing so would have led to only one conclusion: her disability claim was covered. Unum's liability as of the time of its denial was thus reasonably clear.

72.    Instead, Unum's focus on profits over people has led to a breach of its common law duty of good faith and fair dealing. Unum had a duty to investigate, evaluate, and adjust Plaintiff's claim fairly, objectively, and thoroughly. In this instance, its

---

[1] Unum should a copy of the January 24, 2022 deposition testimony of Unum Assistant Vice President Marianne Justin that evidences this approach.

denial was made without any reasonable basis. At all material times, Unum's liability was reasonably clear.

73.    Ms. Quiroga relied on Unum to honestly, objectively, and fairly, investigate and adjust her claims in good faith. That reliance has been to her detriment. Unum's breach of its common law duty of good faith and fair dealing instead caused Ms. Quiroga to suffer considerable emotional distress and mental anguish. This conduct further caused injury and damage, for which she further sues.

## Violations of the Texas Insurance Code

74.    Plaintiff incorporates the preceding factual allegations.

75.    The Texas Insurance Code prohibits, among other things, certain activity by an insurer in the handling and adjustment of claims for policy benefits. Its focus is on the insurers claims handling conduct. Unum, in its handling and adjustment of Plaintiff's claim, has engaged in just such prohibited unfair insurance claims practices in violation of Chapters 541 and 542 of the Texas Insurance Code. These unfair practices have also been committed knowingly. Unum has committed, *inter alia*, the following unfair claims settlement practices:

    i.    Misrepresenting to Ms. Quiroga material facts or policy provisions relating to the coverage at issue;

    ii.    Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of Ms. Quiroga's claim when its liability was reasonably clear;

    iii.    Failing to promptly provide to Ms. Quiroga a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for its denial of a claim or offer of a compromise settlement of a claim;

    iv.    Refusing to pay a claim without conducting a reasonable investigation of the claim;

v.   Knowingly misrepresenting to Ms. Quiroga pertinent facts or policy provisions relating to coverage at issue;

vi.  Making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact, and failing to state those material facts necessary to make other statements made not misleading, considering the circumstances under which the statements were made; and

vii. Engaging in this conduct knowingly with actual knowledge of the falsity, unfairness, or deception of these foregoing acts and practices.

76.  These provisions of the Insurance Code are intended to protect insurance consumers from misleading or false statements about the policy or claim or compel the insurer to disclose material facts to avoid misleading the consumer. They are also intended to compel the insurer to promptly resolve claims when liability is reasonably clear. Unum violated these provisions of the Insurance Code.

77.  One example of a misrepresentation was Unum's July 3, 2019 promise to continually review the claim to determine how long Ms. Quiroga would qualify for benefits. Instead of actively investigating if she qualified for disability benefits, Unum instead looked for reasons to deny the claim. Coverage could have easily been found if Unum fully and fairly reviewed the evidence submitted by Ms. Quiroga any time before she was forced to file this lawsuit. Doing so would have led to only one conclusion: that her disability claim remained covered.

78.  These statements were misleading and were material, and they made it impossible for Ms. Quiroga to determine if Unum had all of the evidence that supported her claim. These statements were intended to mislead and did mislead Ms. Quiroga to a false conclusion about pertinent facts related to the coverage at issue. Unum made no attempt to correct Ms. Quiroga's misunderstanding of this point.

79.    Next, Unum failed to conduct a reasonable investigation of this claim. This happened several ways: (1) ignoring or discounting the evidence from Ms. Quiroga's treating physicians, (2) ignoring Ms. Quiroga's consistent reports of pain, and (3) blindly relying on its own employees to determine that Ms. Quiroga was no longer disabled.

80.    Any claim by Unum that it received no information to support the claim would be untrue. Ms. Quiroga provided Unum all of the information available. Even if Unum believed it had no information to support the claim, as a part of its duty to investigate and perform a reasonable investigation, it was obligated to inform its policyholder what specific information it needed to perfect their claim. It failed to do so. Any investigation Unum undertook cannot be reasonable without at least asking Ms. Quiroga for any information she might have to support their claim.

81.    At no time before this suit was filed did Unum make any attempt, in good faith or otherwise, to settle Ms. Quiroga's claim. Ms. Quiroga made a good faith attempt to settle this case before litigation. For instance, she sent a demand letter in April 2022 in which she provided her total damages and desire to settle the matter without the need for litigation.

82.    In May 2022, Unum expressed a desire to negotiate.

83.    In a phone call with Unum, Ms. Quiroga's counsel offered two settlement options: 1) paying the past due benefits and putting her back on claim or 2) negotiating a lump sum buyout of the claim.

84.    But on June 7, 2022, Unum advised that it would not offer a single penny to settle the claim. It never made a good faith effort to settle the claim.

85.    Despite her attempt to settle her claim before litigation, Unum preferred to wait on Ms. Quiroga to grow tired, get frustrated, and walk away from her claim. Unum chose to ignore the facts. It chose to ignore the evidence. It chose to ignore the equitable bases for coverage. Its liability was reasonably clear. Failing to try to settle this claim promptly, fairly, and equitably was a further violation of the Insurance Code.

86.    At all material times, Unum's conduct in this regard was intentional. It knowingly engaged in this conduct. It knew it had no factual basis upon which to deny Ms. Quiroga's claims. Instead, it intentionally chose to ignore the factual and legal evidence provided by Ms. Quiroga. It chose to parrot its flawed reasoning, perform no new investigation, offer nothing, and hope that Ms. Quiroga would simply go away because she had a "menial" job with a "low dollar" claim.

87.    All of this conduct, along with Unum's other acts and omissions, violated Texas Insurance Code §§541.001, et seq., 542.001, et seq., including the Insurance Code's provision for the prompt payment of claims, §542.051, et seq.

## Knowing Conduct

88.    The conduct complained of in this action was engaged in knowingly as that term is defined in Tex. Ins. Code §541.001(1). Unum knew what it was doing in this claim. It knew its claims handling conduct violated the Texas Insurance Code. It knew of its false, misleading, and deceptive nature conduct in handling this claim.

## Damages

89.    The acts, omission, and practices of Unum constituting a tort were the proximate cause of the damages sustained by Ms. Quiroga. All of Unum's acts and practices

in violation of the various statutes herein recited were the producing cause of the actual damages suffered by Ms. Quiroga, including, but not limited to, damages for mental anguish and emotional distress, as well as actual damages under the insurance contract. For all these wrongful acts, omissions, and practices, Ms. Quiroga is entitled to money damages as may be found by the jury.

90. The acts, omissions, and practices of Unum constituting a tort herein warrant the imposition of 18% per annum pursuant to Tex. Ins. Code §542.060, *et seq*.

91. Unum's actions in handling of Ms. Quiroga's claim were done knowingly and intentionally, or with a conscious or callous disregard for Ms. Quiroga's rights and welfare. As such, its actions reflected gross negligence and were so outrageous as to warrant the imposition of punitive or exemplary damages, for which Ms. Quiroga further sues for recovery. Ms. Quiroga seeks such punitive or exemplary damages as may be assessed by the jury in its discretion.

92. Ms. Quiroga also requests prejudgment interest in addition to the benefits withheld. She is entitled to prejudgment interest as additional compensation, and pursuant to Tex. Ins. Code §1103.104, or on principles of equity.

### Request for Attorneys' Fees

93. This suit was made necessary by the wrongful acts and practices of Unum. Ms. Quiroga has been forced to retain attorneys to prosecute her claims, for which she has agreed to pay a reasonable attorneys' fee. In this regard, she is entitled to recover her reasonable attorneys' fees and expenses incurred and to be incurred in this action for the full prosecution of this claim through trial and appeal, if any, that are reasonable and necessary for her to obtain the relief he seeks. Accordingly,

Ms. Quiroga further seeks recovery of her reasonable attorneys' fees incurred and to be incurred in the prosecution of this action pursuant to pursuant to Section 38.001, *et. seq.* of the Texas Civil Practice and Remedies Code,  Ch. 541 and 542 of the Texas Insurance Code, Section 17.49 *et seq.* of the Business and Commerce Code, and any all other applicable Texas law.

## General Claims

94.    All notices required to be given have been given, and all conditions precedent have been satisfied.

95.    Ms. Quiroga requests prejudgment interest at the maximum rate permitted by law, including that permitted pursuant to Tex. Ins. Code §542.060 and §1103.104(c), or the maximum rate permitted in equity.

## Demand for Jury Trial

96.    Ms. Quiroga demands a jury trial.

## Prayer

For these reasons, Plaintiff requests Unum be cited to appear, and on final trial, Plaintiff obtain a judgment against Unum in an amount in excess of the minimum jurisdictional limits of this Court, Plaintiff be awarded judgment against Unum for the above described damages in the full amounts allowed by law, together with statutory interest, punitive damages, reasonable attorneys' fees incurred herein, pre-judgment and post-judgment interest at the maximum rate allowed by law, costs of court, and all such other and further relief, both at law and in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,


By:_____*/s/ Amar Raval*_____

  Amar Raval, TBA #24046682
  Berg Plummer Johnson & Raval LLP
  3700 Buffalo Speedway, Suite 1150
  Houston, Texas 77098
  (713) 526-0200
  (832) 615-2665 (Fax)
  araval@bergplummer.com

  ATTORNEYS FOR PLAINTIFF